MELISSA FAYE ROGERS,            )
                                )
            Plaintiff           )
                                )
        v.                      )  CAUSE NO: 2:10-cv-201
                                )
MICHAEL J. ASTRUE, Commissioner )
of Social Security,             )
                                )
            Defendant           )


## OPINION AND ORDER

This matter is before the court on the petition for judicial review of the decision of the Commissioner of Social Security filed by the claimant, Melissa Faye Rogers, on October 27, 2009. For the reasons set forth below, the decision of the Commissioner is **AFFIRMED**.

## Background

The claimant, Melissa Faye Rogers, applied for Disability Insurance Benefits on October 30, 2006, alleging a disability onset date of September 2, 2006. Her claim initially was denied on February 17, 2007, and again denied upon reconsideration on June 1, 2007. (Tr. 9) Rogers requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 100) A hearing before ALJ Dennis Kramer was held on February 2, 2009, at which Rogers, medical expert Dr. William Newman, and vocational expert Thomas A. Grzesik testified. (Tr. 23-79)

On September 16, 2009, the ALJ issued his decision denying benefits. (Tr. 19) The ALJ found that Rogers was not under a disability within the meaning of the Social Security Act from September 6, 2006, through the date he issued his decision. (Tr. 9) Following a denial of Rogers' request for review by the Appeals Council, she filed her complaint with this court.

Rogers was born on June 4, 1966, making her 43 years old on the date of the ALJ's decision. (Tr. 29) She is 5'4" in height and weighs approximately 180 pounds. (Tr. 30) Rogers is married with no minor children. (Tr. 30) She has a 12th grade education and last worked as a shipping clerk at the Tree of Life Imports in September 2006. (Tr. 30, 178) Rogers held this position for almost four years before she stopped working because she no longer could lift anything over 15 pounds, bend down, or climb ladders, and because constant pain often left her bed-ridden. (Tr. 32, 177) She did not work at all after September 2006. (Tr. 32)

Rogers was diagnosed with Raynaud's phenomenon, degenerative disc disease, mild degenerative joint disease, lumbar facet joint syndrome, status post lumbar fusion, bilateral sacroiliitis, right lumbar radiculopathy, spinal stenosis, fibromyalgia, osteoarthritis, gastroesophageal reflux disease, and right piriformis syndrome with sciatica and residual nerve damage. (Tr. 236, 244, 259, 274, 381, 402, 543, 644) Rogers has had a long standing

problem with severe lower back pain. (Tr. 447) Beginning in May, 1999, she saw Dr. Kendell Oetter, her treating physician, at the Hoehn Medical Association for pain in the neck and shoulders resulting from a motor vehicle accident. (Tr. 497) Rogers was prescribed a muscle relaxer for pain and participated in physical therapy for her injuries. (Tr. 497) When her pain did not subside, Dr. Oetter referred her to several specialists but continued to see her at least once every three months. (Tr. 50, 466-546)

Dr. Oetter referred Rogers to Dr. Shaun Kondamuri, a pain management specialist, in November 2003, due to severe lower back pain caused by a L4-L5 degenerative disc. (Tr. 238) On November 18, 2003, Dr. Kondamuri performed a lumbar facet joint medial branch block simultaneously with a sacroiliac joint injection to relieve her lower back pain. (Tr. 236-37) Rogers returned for a follow-up on December 8, 2003, and she claimed that she had some improvement from the procedures. (Tr. 235) However, she continued to have some recurrence of her previous symptoms and reported that she developed different symptoms as well. (Tr. 235) Dr. Kondamuri suggested a transforaminal epidural steroid injection for further pain relief. (Tr. 235) Rogers never returned for this procedure. (Tr. 233)

Rogers first saw Dr. Patrick J. Sweeney by referral from Dr. Oetter in December 2003, for her lower back pain which radiated down her right leg and buttock.  (Tr. 324, 410) An MRI was performed which confirmed L4-L5 degenerative disc disease.  Dr. Sweeney did not recommend any further injections as was suggested by Dr. Kondamuri.  (Tr. 324) Instead, Dr. Sweeney recommended physical therapy before proceeding with further treatment.  (Tr. 324)

Dr. Oetter next referred Rogers to Dr. Jalaja V. Piska, a specialist in pain management, in August 2004, when she complained that her lower back pain radiated into the buttocks, groin area, and thigh area, with more significant pain on the right side.  (Tr. 278) She also experienced numbness, tingling, and weakness in the hips, with more significant pain on the right side.  (Tr. 278) Upon physical examination, Dr. Piska made the following findings: toe and heel walking were intact, but slightly difficult; lumbar flexion at 30 degrees was associated with mild pain; lumbar extension at 30 degrees was associated with mild pain; side bending at 10 degrees was associated with mild lower back pain; tenderness was present over the right sacroiliac joint; straight leg raising test was positive on the right side with lower back pain; Patrick sign was positive on the right side with lower back pain; all muscle groups in bilateral lower

extremities were 4/5; and knee and ankle reflexes could not be elicited bilaterally. (Tr. 279) Dr. Piska prescribed Bextra, an anti-inflammatory medication, in addition to the Vicodin prescribed by Dr. Sweeney. (Tr. 280) Additionally, a trial implantation of a spinal cord stimulator was scheduled. (Tr. 280)

Dr. Ramesh Kanuru performed the implantation of the spinal cord stimulator on October 21, 2004. Rogers was discharged in good condition the same day and prescribed Tab Levoquin for seven days. (Tr. 277) The trial spinal cord stimulator was to be removed within five to seven days. (Tr. 277) A day after the procedure, Rogers experienced severe pain. (Tr. 275) After speaking with Dr. Kanuru on the phone, Rogers turned off the stimulator, and it took about 12 hours before she could put weight on her legs. (Tr. 275 The spinal cord stimulator was removed on October 25, 2004. (Tr. 275) She was given a prescription for a Duragesic patch and Oxy IR for breakthrough pain. (Tr. 275)

After physical therapy, a Vicodin prescription, and the spinal cord stimulator failed to alleviate her pain, Dr. Sweeney performed a diagnostic discogram on February 20, 2004, which showed positive pain at L4-5 and L5-S1 with L4-5 having a full thickness tear. (Tr. 410, 418) On March 5, 2004, Dr. Sweeney

performed an L4-5, L-5, S1 right endoscopic laser assisted discectomy. (Tr. 410)

When her pain did not subside, a disc fusion was recommended due to the extensiveness of her pain and the multiple discs involved. (Tr. 402) A preoperative chest x-ray showed a normal heart and clear lungs. (Tr. 384) Dr. Sweeney performed a L4-5, L5-S1 decompression and fusion on December 6, 2004, without complications. (Tr. 398) On December 10, 2004, Rogers was discharged with Lorcet Plus for pain, as well as a rolling walker and a toilet seat. (Tr. 397)

On April 6, 2005, Rogers was admitted to the hospital by Dr. Sweeney due to muscle spasms in her hip and groin. (Tr. 358) A right hip arthrogram was performed with normal results, but an x-ray demonstrated mild degenerative joint disease with osteophytes arising from the femoral head. (Tr. 358) The following week, Rogers saw Dr. Rafael Fletes, a nephrology specialist, for the evaluation of possible kidney disease because of her groin pain. (Tr. 514) The urine analysis could not be interpreted without additional information, which included determining whether Rogers had lupus. (Tr. 516) Dr. Fletes believed that if Rogers did have lupus, her hematuria potentially could be lupus nephritis. (Tr. 516) If she did not have lupus, it would need to be confirmed that she did not have a microscopic hematuria. (Tr. 516) Rogers

was instructed to repeat the urine analysis two more times before returning for a follow-up, and a renal ultrasound was recommended. (Tr. 517, 509)

Rogers had her follow-up visit with Dr. Fletes on May 4, 2005. (Tr. 509) The results of the renal ultrasound revealed no evidence of hydronephrosis or a space occupying lesion, but there was echogenic complex in the collecting system of both kidneys, which was suspicious for renal calculi. (Tr. 509) The repeated urine analysis showed no evidence of hematuria. (Tr. 509) Dr. Fletes explained that if she did in fact have a microscopic hematuria, the course generally would be benign. (Tr. 510) Dr. Fletes referred Rogers back to Dr. Oetter, stating that if she was interested in pursuing the issue further, she should be seen by a urologist. (Tr. 510)

In September 2005, Dr. Sweeney referred Rogers to Dr. Kanuru for an epidural steroid injection. At that time, Rogers graded her pain at five on a scale of zero to ten. (Tr. 272) Upon physical examination, Dr. Kanuru found: heel walking was difficult; toe walking was intact; lumbar flexion at ten degrees was associated with mild pain; side bending at ten degrees on the right was associated with pain in the right lower back; tenderness was present over the paraspinal muscle in the lumbar area bilaterally; straight leg raising test was positive on the right

side with pain in the lower back; Patrick sign was positive on the right side and associated with pain in the lower back; and all the muscle groups were weaker on the left side in comparison to the right side.  (Tr. 273) Dr. Kanuru diagnosed Rogers with right lumbar radiculopathy and bilateral sacroilitis.  (Tr. 274) A caudal epidural steroid injection and right sacroiliac joint injection under fluoroscopy were recommended for treatment.  (Tr. 274) Dr. Kanuru performed the two procedures that same day.  (Tr. 270) Rogers was discharged in good condition and advised to follow-up with Dr. Sweeney for care.  (Tr. 271)

In November 2005, Rogers returned to Dr. Kanuru on a referral from Dr. Sweeney because she still was experiencing pain. (Tr. 254) Rogers rated her pain as an eight on a zero to ten scale.  (Tr. 252) Upon physical examination, Dr. Kanuru found: heel walking was difficult; toe walking was intact; lumbar flexion at ten degrees was associated with mild pain; lumbar extension at 15 degrees was associated with mild lower lumbar pain; lumbar rotation bilaterally was associated with pain; side bending at ten degrees on the right was associated with right lower back pain; tenderness was present over lumbar facet joint at L2, L3, and L4; mild tenderness was present over the right sacroiliac joint; straight leg raising test at 90 degrees was negative bilaterally; Patrick sign was positive on the right side

and was associated with pain in the lower back; a muscle weakness was noted bilaterally graded at 3/5; bilateral knee reflexes were absent; and extensor hallucis longus was weaker bilaterally graded at 3/5.  (Tr. 254)

Rogers was advised to stop taking Loracet and Zanaflex as prescribed by Dr. Sweeney.  (Tr. 254) Dr. Kanuru prescribed Avinza, Ultracet for breakthrough pain, and Soma at bedtime. (Tr. 254) Rogers was advised to return to the office in one month if her pain did not subside.  (Tr. 254) In December 2005, Rogers returned to Dr. Kanuru because she still was experiencing pain, as well as numbness in her right foot and numbness and tingling in both hips.  (Tr. 247) Rogers stated that the Avinza did not make her feel well, and Kadian was prescribed in its place.  (Tr. 249)

In May 2006, Rogers saw Dr. Charles Bush-Joseph at Rush University Medical Center.  (Tr. 447) Dr. Bush-Joseph reviewed radiographs of Rogers' hip.  He concluded that they were consist- ent with osteophytic spurring of the femoral head but that there was no significant joint space narrowing or loose bodies noted. (Tr. 447) Dr. Bush-Joseph gave Rogers an interarticular fluoro- scopic injection in her right hip.  This injection gave relief from the groin pain but no relief for her back pain.  (Tr. 447) Rogers returned to Dr. Bush-Joseph in August 2006 because her

pain had returned about 45 minutes after the injection.  (Tr. 444) Dr. Bush-Joseph scheduled Rogers for a hip arthroscopy. (Tr. 444)

On September 28, 2006, Rogers saw Dr. Oetter because she had fallen two weeks prior at her home.  (Tr. 470) She complained of a very stiff lower back with stabbing pains.  (Tr. 470) Dr. Oetter prescribed Zanaflex, Relafen, and Vicoden.  (Tr. 470) Rogers was scheduled for right hip arthroscopy the following week with Dr. Bush-Joseph.  The arthroscopy was performed at Rush University Medical Center.  (Tr. 432) The arthroscopy revealed a right hip labral tear.  (Tr. 432)

In January 2007, at the request of the Social Security Administration, Rogers underwent a consultative examination by a state agency physician, Dr. Phillip S. Budzenski.  (Tr. 549) Upon physical examination, Dr. Budzenski found: no tenderness in the spinous processes or paravertebral muscle spasm; flexion of the cervical spine was normal to 50 degrees; extension of the cervical spine was normal to 60 degrees; lateral bend was preserved to 45 degrees bilaterally; and rotation was preserved to 80 degrees bilaterally.  (Tr. 551) Additionally, examination of the dorso-lumbar spine showed: no apparent kyphosis or scoliosis; no paravertebral muscle spasm or tenderness to palpation of the spinous processes; forward flexion of the lumbosacral spine was

limited to 30 degrees; lateral bend was limited to ten degrees; straight leg raising test was negative to 90 degrees bilaterally in a seated position; and straight leg raising test was positive on the right at 40 degrees but negative on the left to 60 degrees in the supine position. (Tr. 551)

Examination of Rogers' right hip showed moderate tenderness to palpation with mild tenderness on the left and no atrophy. (Tr. 552) Examination of the left hip showed no tenderness or atrophy. Her range of motion in her right hip was limited to 20 degrees of abduction, ten degrees of adduction, 90 degrees of flexion, 15 degrees of internal rotation, 40 degrees of external rotation, and 15 degrees of extension. (Tr. 552) Range of motion of the left hip showed normal external rotation to 50 degrees, but otherwise range of motion was limited to 25 degrees of abduction, ten degrees of adduction, 90 degrees of flexion, 20 degrees of internal rotation, and 20 degrees of extension. (Tr. 552)

Examination of the right knee showed moderate crepitus with range of motion. (Tr. 552) Examination of the knees revealed no tenderness, swelling, effusion, laxity, or nodules. Rogers' knees extended to zero degrees, flexion on the right was limited to 120 degrees, and the left was limited to 135 degrees. (Tr. 552) Dr. Budzenski's impression included hip pain, lumbago, degenerative joint disease of the right knee, and obesity by body

mass criteria.  His assessment stated that Rogers could perform light work eight hours a day, but he would limit ambulation to 15 minutes at a time up to two hours a day and limit standing to four hours a day.  (Tr. 552)

In April 2007, Rogers saw Dr. Larry R. Brazley, a rheumatologist.  Dr. Brazley noted that Rogers' most recent bone scan revealed degenerative changes in the shoulders, lower back, and knees.  (Tr. 700) The impression was probable bilateral carpal tunnel, rotator cuff tendonitis with osteoarthritis of the shoulders, probable gastroesophageal reflux disease, status post lumbar laminectomy, right piriformis syndrome with sciatica and residual nerve damage, and osteoarthritis of the knees.  (Tr. 701) Dr. Brazley recommended a physical therapy evaluation and scheduled Rogers for a nerve conduction of both upper and lower extremities.  (Tr. 701) Rogers was prescribed Chantix to help her stop smoking, Ambien for sleep, Norflex, Lyrica, Arthotec, and Nexium for her stomach.  (Tr. 702)

In January 2008, Rogers returned to Dr. Kondamuri claiming that her pain was relieved only 0-25 percent with her current medications.  She rated her pain as an eight to ten on a ten point scale.  (Tr. 629) Dr. Kondamuri found: left extension on the left lumbar range produced very limited extension; straight leg raise test in a supine position on the right and left were

positive with groin pain; Patrick sign on the right was positive for groin pain, but the left was negative; and palpation of the lumbar spine was tender at the right and left sacroiliac joint areas. (Tr. 629) Dr. Kondamuri stated that he could not determine what was causing her pain. (Tr. 629) He stated that it was possible that Rogers had intraarticular hip joint pathology, but he thought this to be unlikely. (Tr. 630) He concluded that it was more probable that she had sacroilitis or sacroiliac strain but that it would not be expected that a patient would be as incapacitated by the condition as Rogers was. (Tr. 630)

In February 2008, Rogers returned to Dr. Brazley. Dr. Brazley stated that the most recent MRI scan of the right hip was unremarkable and that upon examination Rogers had reasonably good range of movement of the right hip. (Tr. 634) However, there was tenderness over the pectineus muscle and the sartorius muscle. Dr. Brazley said that it was possible that the tenderness was related to a L5-S1 sensory neuropathy. (Tr. 634) He lowered her Lyrica dose due to stomach problems and switched the Norflex to Tizanidine, which is a muscle relaxant and controls chronic pain. He also referred Rogers to physical therapy for gentle hip stretching and condition exercises for her abdominal and lower back muscles. (Tr. 634)

On June 2, 2008, Rogers underwent a right knee arthroscopy by Dr. Brazley.  Post-operative diagnosis was osteochondritis desiccans and stage 3-4 chondromalacia.  (Tr. 677) The chondromalacia revealed significant degenerative changes at the patellofermoral.  (Tr. 678) Rogers was discharged later that day after her vital signs stabilized.  (Tr. 678)

In May 2008, rogers saw Dr. David Ray, a podiatrist, at the recommendation of Dr. Oetter.  She complained of heel pain and a wart on her left foot.  (Tr. 734) Dr. Ray diagnosed: chronic plantar fasciitis with associated calcaneal spur syndrome bilaterally; verruca plantaris formation of the ball area on the left foot; venous insufficiency; and tinea pedis. (Tr. 734) Therapeutic injections were administered to both heels, taping and strappings were applied bilaterally, and prescription for compression stockings and econazole cream were prescribed.  (Tr. 734) Rogers returned to Dr. Ray in June 2008, claiming that she still was experiencing pain in both heels.  (Tr. 735) Taping and strappings were applied to both feet and ankle areas, gastrocstretching exercises were assigned, and a prescription for Medrol Dosepak was given.  (Tr. 735)

Rogers returned to Dr. Ray again in late June 2008 claiming she still had discomfort in her arch and heel regions as well as the anterior aspect of both legs.  Plasters were taken for

orthotics, and issues concerning wart surgery were discussed. (Tr. 736) Rogers received her orthotic devices in August 2008. (Tr. 737)

In August 2008, Rogers saw Dr. Andy Akan, a neurologist, complaining of cramping of bilateral lower extremities from the knees to the feet, persistent lower back pain, and weakness. (Tr. 631) A neurological systems review was positive for poor balance and coordination with some falls. (Tr. 631) Dr. Akan prescribed Cymbalta for pain control, ordered an EMG of the bilateral lower extremities, an MRI of the lumbar spine, and asked Rogers to follow-up in six to eight weeks. (Tr. 632) The EMG of the bilateral lower extremities was normal without evidence of acute lumbar radiculopathy or neuropathy. (Tr. 756) The MRI of the lumbar spine showed status post posterior fusion with no hardware complication, satisfactory alignment, and no compression fracture or spondylolisthesis. (Tr. 752-53) There also was no significant disc herniation, canal stenosis, or neural foraminal narrowing from T-12-L1 to L4-L5 levels. (Tr. 753) There was mild central to left-sided disc herniation at L5-S1 level with no significant canal stenosis or neural foraminal narrowing. (Tr. 753)

In January 2009, Dr. Akan performed a neurological examination due to Rogers' difficulty ambulating. (Tr. 740) The sensory

15

organization test revealed abnormalities in the patient's ability to use input cues from the somatosensory system.  (Tr. 740) Motor control testing was difficult to do secondary to lower back pain. Limits of stability testing showed abnormalities in Rogers' reaction time, the average speed of movement, the distance to Rogers' first attempt towards a target set, and the maximum distance achieved towards a target set.  (Tr. 740)

At the hearing before the ALJ, Rogers testified that she was supposed to be working 30 hours per week but had to consistently call off because her pain often left her bed-ridden.  (Tr. 32) She also stated that her hips hurt, that her right leg kept going numb, and that she had cramping in her shins.  (Tr. 32) She testified that she had pain in her lower back that radiated to her right leg and foot.  She said that her right leg sometimes went numb, that her right foot was almost numb, and that her toes were constantly numb.  (Tr. 33) Rogers said there were weeks where she did not leave her home unless her husband drove her to a doctor's appointment.  (Tr. 33) She stated that the highest level of pain she had on a ten point scale was a ten about every six months and that she had to go to the hospital.  (Tr. 33) She said that on average her pain was about a six with medication. (Tr. 34)

Rogers testified that she used a walker about once a month because of her numbness. (Tr. 34) She stated that the pain in her right hip radiated to her groin, that her highest pain level was a ten about every six months to a year, but that the average pain level was a three to four. (Tr. 36) She explained that her knee swelled up and that she could not get herself into a standing position. (Tr. 36) She stated her pain level on the knee was a five or six. (Tr. 37) Rogers had Raynaud's in the left hand, and she wore a glove due to coldness. She also had a weak grip on the left hand. (Tr. 38) She testified that she could type for a limited duration. She also stated that it took an hour and a half to get her hand warmed up after not using it. (Tr. 38)

Rogers further testified that she possibly could climb stairs with baby steps but that she has not tried. She could not climb a ladder. (Tr. 39) She stated that she could not walk a block without the walker. (Tr. 40) Rogers could drive only locally, such as to the gas station. She could go grocery shopping only with her husband so he could help her pack the groceries. She also had to get an electric cart when she went to the store, but normally her husband went for her. (Tr. 40) Rogers usually awakened between 2:00 A.M. to 5:00 A.M., and she watched T.V. or read the newspaper. (Tr. 41) She laid back down around 7:00 A.M. or 8:00 A.M. for about an hour, and then she ate

breakfast. (Tr. 41) She had to elevate her right leg approximately every 30 minutes about as high as chair level for 20 minutes to get the swelling down. (Tr. 41)

Rogers did very little housework, but could dust a little bit and sometimes load the dishwasher. She testified that she could lift about eight pounds and walk about ten feet with it. (Tr. 42) She stated that she could stand for about 30 minutes before she would have to sit down. (Tr. 43) Rogers was not sure if she could kneel down because she had not tried. (Tr. 46) She also stated that she could squat but that she could not bend over to touch her toes. (Tr. 46) She could reach her arms above her head. She spent four or five hours a day laying down. (Tr. 46) Rogers could not complete two-handed functions such as screwing a nut. (Tr. 47) She could not hold a grocery bag with two hands, however she could lift about one pound with her left hand. (Tr. 47)

Rogers was taking Percocet, Cymbalta, Nexium, and Valium as needed for groin and hip pain. (Tr. 49) She stated that her daily groin pain felt like someone was squeezing her and would not stop. (Tr. 49) She stated that movement aggravated this pain. Rogers was able to concentrate for only an hour and a half when she had a high level of pain. (Tr. 50) She also stated that

Dr. Oetter, Dr. Akan, and Dr. Brazley had told her she had nerve damage from her lumbar fusion. (Tr. 51)

Dr. William Newman testified at the hearing as a medical expert. He stated that Rogers' main problem was her lower back. (Tr. 53) The MRI of her hip only showed mild degenerative changes, no avascular necrosis, and good or possibly a slight decrease in the joint space. The nerve conduction on the right leg done by Dr. Brazley was normal. (Tr. 53) When circumferential measurements were taken in January 2007 to determine whether she actually used the leg, the calf on the right was 40 and the left was 40.5, and the circumference of both thighs was 55.5. (Tr. 53-54) Dr. Newman stated that this meant Rogers was using her right leg. (Tr. 54) Her motor sensory and reflexes were normal. Dr. Brazley noted a crepitus in the right knee, range of motion from 0 to 120, and no laxity or swelling of the right knee. (Tr. 54) While there was a diagnosis of chondromalacia and osteoarthritis dissecans, Dr. Newman did not know where that diagnosis came from because it was not reported in the arthroscopy. Rogers gained about 50 pounds since she had the lumbar fusion so that could be contributing to her back pain. (Tr. 54) Dr. Newman found no objective evidence of a neurological deficit, noted that Rogers had status post lumbar fusion, and concluded that there also might be a Grade 3 chondromalacia.

(Tr. 55) The ME concluded that Rogers' medical conditions did not meet or equal a listing. (Tr. 54) Dr. Newman stated that Rogers could perform sedentary jobs given her weight and the fusion. (Tr. 55)

The ME stated that Rogers could lift up to 15 pounds occasionally and up to ten frequently. (Tr. 55) She could sit for about an hour and a half at one time, stand for 45 minutes, and walk for 45 minutes. (Tr. 56) Her Raynaud's would be a problem only if she had to work outside or in a freezer. (Tr. 56) She could climb stairs occasionally, and she could stoop and kneel less than a third of the day. She could shop, ambulate without a wheelchair, walk a block at a reasonable pace, use public transportation, climb a few steps, prepare a simple meal, care for her personal hygiene, and handle paper files. (Tr. 56)

Vocational Expert Thomas Grzesik was the last to testify. (Tr. 73) The ALJ posed a series of hypothetical questions. (Tr. 74-78) First, the ALJ asked the VE about the ability to perform any past work or work with transferable skills taking into account Rogers' age, education, previous work experience, and the findings from Exhibit 16F which did not have an RFC questionnaire. (Tr. 74) The VE responded that she would be able to perform her previous job as a telemarketer. This was a sedentary exertion level. (Tr. 74)

The ALJ's second hypothetical assumed an individual of Rogers' age, education, and work experience who was able to walk half a city block, sit for 20 minutes at a time, stand for ten to 15 minutes at a time, carry less than ten pounds rarely, and who needed periods for walking every 15 to 20 minutes, unscheduled breaks, and time to elevate her legs throughout the day. (Tr. 74) The VE stated that she would not be able to perform any of her past work because the amount of time for sitting, standing, and walking would not equate to a full work day. (Tr. 75)

The third hypothetical the ALJ posed assumed an individual with Rogers' age, education, and previous work experience who was able to lift and carry up to 20 pounds occasionally, lift and carry up to ten pounds frequently, stand and walk for about six hours in an eight-hour work day, sit for about six hours in an eight-hour work day, and push or pull with limitations in the lower extremities. (Tr. 75) The VE responded that this was a light RFC and that Rogers would be able to perform her past work as a dining room hostess, a waitress, and a telemarketer. (Tr. 75)

Hypothetical four assumed an individual who had Rogers' age, education, and previous work experience; who could walk only half a city block, stand for 30 minutes before having to sit for 20 or 30 minutes, and sit for 30 minutes; who had to elevate her right

leg at chair height for about 30 minutes; who could lift and carry eight pounds occasionally, squat occasionally, and reach her arms above her head; and who could not climb a ladder or bend to touch her toes. (Tr. 75-76) The VE stated that she could not perform her previous work and that there would be no transferable skills that met this criteria because of the elevation of the legs. (Tr. 76)

The last hypothetical was the same as hypothetical four but without the need to elevate the legs. (Tr. 77) The VE responded that she would be able to perform her job as a telemarketer. This was a sedentary exertion level with a sit/stand option. (Tr. 77)

In his decision, the ALJ discussed the five-step sequential evaluation process for determining whether an individual was disabled. (Tr. 10-11) In step one, the ALJ found that Rogers had not engaged in substantial gainful activity since September 2, 2006, her alleged onset date, through the date of her hearing. (Tr. 11) At step two, the ALJ found that Rogers had the following severe impairments: disorder of the back (degenerative disc disease), status post L4-S1 fusion, osteoarthritis of the right hip and right knee, and status post right knee arthroscopy. (Tr. 11) At step three, the ALJ found that Rogers' impairments did

not meet or medically equal one of the listed impairments. (Tr. 11)

In determining Rogers' RFC, the ALJ stated that he considered the entire record and found that Rogers had the capacity to perform the full range of sedentary work involving lifting no more than ten pounds at a time, occasionally lifting and carrying articles like docket files, ledgers, and small tools with a necessity for walking and standing throughout the workday. (Tr. 11) In reaching this determination, the ALJ first discussed the consultative examination by Dr. Budzenski in January 2007. (Tr. 12) Dr. Budzenski found that Rogers exhibited signs of a post-laminectomy syndrome with no evidence for a herniated disc or bulging at any level. (Tr. 12) His diagnostic impression included hip pain, lumbago, degenerative joint disease of the right knee, obesity by body mass criteria, and a history of L4-L5, L5-S1 lumbar fusion. (Tr. 13) Dr. Budzenski concluded that in regard to the work place, the claimant should be able to perform light work eight hours a day. (Tr. 13) Dr. Budzenski stated that ambulation should be limited to 15 minutes at one time and up to two hours a day, and that standing should be limited to four hours a day. (Tr. 13)

The ALJ went on to discuss Rogers' medical history, starting with Dr. Brazley in May 2007. (Tr. 13) Her most recent bone scan

from April 2008 revealed degenerative changes in the shoulders, low back, and knees. (Tr. 14) Dr. Brazley's diagnostic impression included probable bilateral carpal tunnel, rotator cuff tendonitis with osteoarthritis of the shoulders, probable gastro-esophageal reflux disease, status post lumbar laminectomy, right piriformis syndrome with sciatica and residual nerve damage, and osteoarthritis of the knees. (Tr. 14) A nerve conduction study of the upper and lower extremities revealed no evidence for carpal tunnel and no evidence for a lumbosacral radiculopathy. (Tr. 14) Dr. Brazley stressed the importance of weight loss and constant conditioning. (Tr. 14)

The ALJ next discussed Rogers' January 2008 visit with Dr. Kondamuri. (Tr. 14) Dr. Kondamuri could not determine what the source of her pain was, but it did not appear to be any specific pathology. (Tr. 15) He believed that it was unlikely that Rogers had intra-articular hip joint pathology. He thought that it was more likely that she had sacroilitis or sacroiliac strain. (Tr. 15) He stated that Rogers was argumentative when he suggested lifestyle changes and exercise plans. (Tr. 15) He was concerned with Rogers' high use of opioids and he believed that she should see a psychologist or social worker in order to understand secondary pain issues. (Tr. 15) Dr. Kondamuri advised Rogers to

see an orthopedic hip surgeon to evaluate the hip and to confirm that there was no true hip pathology. (Tr. 15)

The next visit the ALJ discussed was with Dr. Akan in August 2008. (Tr. 15) Dr. Akan wanted to rule out active versus chronic lumbar radiculopathy and possible entrapment neuropathy. His plan was to obtain an electromyography of the bilateral lower extremities, an MRI of lumbar spine, and computerized dynamic posturography testing. (Tr. 15-16) He suggested occupational therapy evaluation and treatment and Cymbalta for pain control. (Tr. 16) The electromyography of the bilateral lower extremities showed no evidence of acute lumbar radiculopathy changes or any other changes except for those commonly seen in a patient's post lumbar spine surgery. (Tr. 16) The MRI showed evidence of the L4-S1 fusion, but no hardware complications, no significant disc herniation, canal stenosis, or neural foraminal narrowing. (Tr. 16) The posturography study indicated that Rogers had abnormalities in her ability to use input cues from the somatosensory system, that motor control testing was difficult to do to secondary lower back pain, that the limits of stability testing showed abnormalities in her reaction time, average speed of movement, distance to her first attempt towards a target set, and maximum distance achieved towards a target set. (Tr. 16) Neither the

therapist nor Dr. Akan had offered an assessment of the signifi-
cance of the posturography findings. (Tr. 16)

The last visit that the ALJ discussed was with Dr. Brazley
in April 2009. (Tr. 16) Dr. Brazley considered Rogers' diagnosis
as generalized osteoarthritis. He reviewed her records and noted
that she had a bone scan in 2007 that revealed moderate degenera-
tive changes in the right shoulder, knees, ankles, and lower
back. (Tr. 16) A nerve conduction test did not reveal a definite
radiculopathy. An MRI revealed degenerative changes, and Dr.
Brazley suspected she had moderate degenerative arthritis of the
hip. (Tr. 16) Dr. Brazley prescribed ibuprofen and Ultracet and
advised her to stay on Percocet and Nexium. He recommended a
pulmonary function test and advised against cigarette usage.
Finally, he repeated an x-ray of the hip because he suspected
that her right hip disease had worsened. (Tr. 16)

The ALJ next considered Rogers' daily activities and ability
to care for herself. She testified that she spent most of her
time at home caring for her own needs and that she did very
little housework. (Tr. 16) She believed that she could walk only
one block, sit for 30 minutes, and lift a gallon of milk. (Tr.
16-17) She laid down every 30 minutes, could not climb stairs or
ladders, and could not kneel, squat, or bend at the waist. (Tr.
17)

The ALJ then discussed the testimony of the medical expert, Dr. Newman. (Tr. 17) He testified that Rogers' alleged limitations exceeded those that reasonably could be expected in light of the actual clinical findings. He believed that her primary problem was lower back pain following disc surgery which was aggravated by obesity. (Tr. 17) He stated that she had some chondromalacia in the right knee which was cleaned out by the arthroscopic surgery. (Tr. 17)

Dr. Newman determined that Rogers was capable of performing the full range of sedentary work since her alleged onset date. (Tr. 17) Rogers basically had full use of the upper extremities except that she should not work outdoors in the cold or in a freezer or cooler due to her Raynaud's syndrome. Dr. Newman noted that while Dr. Oetter found Rogers to be much more limited, his findings were not supported by any objective clinical findings and were not consistent with the findings of the attending rheumatologist, orthopedist, or pain specialist. (Tr. 17)

The ALJ went on to state that "after careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms . . . . However, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are incon-

sistent with the above residual function capacity assessment."
(Tr. 17) The ALJ explained that Rogers had been treated by
orthopedic surgeons, a rheumatologist, and a pain specialist
since her 2004 surgery and that they all recommended conservative
management of the back pain by suggesting she lose weight and
increase her activities. (Tr. 17) Rogers had been prescribed
narcotic medications and claimed to lead a severely restricted
lifestyle. (Tr. 17) However, the ALJ did not believe that the
objective clinical findings substantiated a condition that would
prevent her from performing sedentary work. (Tr. 17) The ALJ
concluded by discounting the opinion of Rogers' treating physi-
cian, Dr. Oetter, and assigning greater weight to the opinion of
Dr. Newman, the medical expert. (Tr. 17-18)

     With the RFC determined, at step four the ALJ found that
Rogers could perform her past relevant work as a telemarketer.
(Tr. 18) The ALJ explained that Rogers' testimony indicated that
her previous work as a telemarketer required her to sit at a desk
and make phone calls and that there was no significant lifting or
carrying involved. (Tr. 18) The vocational expert testified that
the limitations described would not preclude Rogers' work as a
telemarketer, either as she performed it or as it was commonly
performed in the national economy. (Tr. 18) It was not necessary

for the ALJ to proceed to step five because step four was met.
(Tr. 11)

## Discussion

The standard for judicial review of an ALJ's finding that a
claimant is not disabled within the meaning of the Social Secu-
rity Act is limited to a determination of whether those findings
are supported by substantial evidence.  42 U.S.C. §405(g) ("The
findings of the Commissioner of Social Security, as to any fact,
if supported by substantial evidence, shall be conclusive.");
*Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex
rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  Sub-
stantial evidence has been defined as "such relevant evidence as
a reasonable mind might accept to support such a conclusion."
*Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28
L.Ed.2d 852 (1972)(*quoting* *Consolidated Edison Company v. NLRB*,
305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 140 (1938)).
*See also* *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003);
*Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002).  An ALJ's
decision must be affirmed if the findings are supported by
substantial evidence and if there have been no errors of law.
*Rice v. Barnhart*, 384 F.3d 363, 368-69 (7th Cir. 2004); *Scott v.
Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).  However, "the deci-

sion cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539.

Disability insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act.  The claimant must show that he is unable

> to engage in any substantial gainful activity
> by reason of any medically determinable phys-
> ical or mental impairment which can be ex-
> pected to result in death or which has lasted
> or can be expected to last for a continuous
> period of not less than 12 months.

42 U.S.C. §423(d)(1)(A)

The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability.  20 C.F.R. §404.1520.  The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." 20 C.F.R. §404.1520(b).  If she is, the claimant is not disabled and the evaluation process is over.  If she is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities."  20 C.F.R. §404.1520(c).  Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations.  20 C.F.R. §401, pt. 404, subpt. P, app. 1.  If it does, then the impairment is acknowledged by the Commissioner to

be conclusively disabling.  However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" (RFC) and the physical and mental demands of her past work.  If, at this fourth step, the claimant can perform her past relevant work, she will be found not disabled.  20 C.F.R. §404.1520(e).  However, if the claimant shows that her impairment is so severe that she is unable to engage in her past relevant work, then the burden shifts to the Commissioner to establish that the claimant, in light of her age, education, job experience and functional capacity to work, is capable of performing other work and that such work exists in the national economy.  42 U.S.C. §423(d)(2); 20 C.F.R. §404.1520(f).

Rogers first challenges the ALJ's RFC finding, claiming that the ALJ did not properly evaluate Rogers' limitations in sitting, failed to explain properly why he did not include any limitation in use of the hands, and did not discuss Rogers' need to elevate her legs periodically.  Social Security Ruling 96-8p explains how an ALJ should assess a claimant's RFC at steps four and five of the sequential evaluation.  In a section entitled "Narrative Discussion Requirements," SSR 96-8p specifically spells out what is needed in the ALJ's RFC analysis.  This section of the Ruling provides:

The RFC assessment must include a narrative
discussion describing how the evidence sup-
ports each conclusion, citing specific medi-
cal facts (e.g., laboratory findings) and
nonmedical evidence (e.g., daily activities,
observations).  In assessing RFC, the adjudi-
cator must discuss the individual's ability
to perform sustained work activities in an
ordinary work setting on a regular and con-
tinuing basis (i.e., 8 hours a day, for 5
days a week, or an equivalent work schedule),
and describe the maximum amount of each work-
related activity the individual can perform
based on the evidence available in the case
record.  The adjudicator must also explain
how any material inconsistencies or ambigui-
ties in the evidence in the case record were
considered and resolved. (footnote omitted)

SSR 96-8p

Thus, as explained in this section of the Ruling, there is a

difference between what the ALJ must contemplate and what he must

articulate in his written decision.  "The ALJ is not required to

address every piece of evidence or testimony presented, but he

must provide a 'logical bridge' between the evidence and his

conclusions." *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008)

(*quoting Clifford v. Apfel*, 227 F.3d 863 (7th Cir. 2000)).

Because the ALJ does not need to discuss every piece of

evidence in his written decision, he was not required to evaluate

specifically Rogers' limitations in sitting, the ability to use

her hands, or the need to elevate her legs periodically when

making his decision.  Rather, the ALJ needed to consider the

"aggregate effect" of all conditions, even those conditions that,

in isolation, were not severe.  *Golembiewski v. Barnhart*, 322
F.3d 912, 918 (7th Cir. 2003).  Rogers has not demonstrated that
the ALJ failed to meet this burden.

Rogers first argues that the ALJ did not properly evaluate
her limitations in sitting, which she claims is limited to ten to
15 minutes at a time.  This is not supported by the medical
evidence or Rogers' testimony.  *See Sienkiewicz v. Barnhart*, 409
F.3d 798, 804 (7th Cir. 2005) (explaining that inconsistencies
between the pain alleged by the applicant and the results of
medical evidence "is probative of exaggeration.") (internal cita-
tions omitted).  The specialists who saw Rogers did not recommend
any sitting limitations.  The ME found that Rogers could sit for
up to 90 minutes at a time and for six hours during a typical
workday.  (Tr. 17) The only physician to verify Rogers' ten to 15
minute limitation was her treating physician, Dr. Oetter.
However, he stated that she could sit for 20 minutes before
needing to stand.  (Tr. 770)

Although the opinion most closely supporting Rogers' testi-
mony came from her treating physician, the ALJ adequately ex-
plained why he was not following it.  A treating source's opinion
only is entitled to controlling weight if the "opinion on the
issue(s) of the nature and severity of [the claimant's] impair-
ment(s) is well-supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record.  20 C.F.R. §404.1527(d)(2).  *See also **Schmidt v. Astrue***, 496 F.2d 833, 842 (7th Cir. 2007); ***Gudgell v. Barnhart***, 345 F.3d 467, 470 (7th Cir. 2003).  The ALJ must "minimally articulate his reasons for crediting or rejecting evidence of disability." ***Clifford***, 227 F.3d at 870 (*quoting **Scivally v. Sullivan***, 966 F.2d 1070, 1076 (7th Cir. 1992)).  *See also* 20 C.F.R. §404.1527(d)(2) ("We will give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").

Internal inconsistencies in a treating physician's opinion may provide a good reason to deny it controlling weight.  20 C.F.R. §404.1527(c)(2); ***Clifford***, 227 F.3d at 871.  Furthermore, controlling weight need not be given when a physician's opinions are inconsistent with his treatment notes or are contradicted by substantial evidence in the record, including the claimant's own testimony.  ***Schmidt***, 496 F.2d at 842 ("An ALJ thus may discount a treating physician's medical opinion if the opinion is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability.").  *See, e.g., **Latkowski v. Barnhart***, 93 Fed.Appx. 963, 970-71 (7th Cir. 2004); ***Jacoby v. Barnhart***, 93

34

Fed.Appx. 939, 942 (7th Cir. 2004).  Ultimately, the weight ac-
corded a treating physician's opinion must balance all the cir-
cumstances, with recognition that while a treating physician "has
spent more time with the claimant," the treating physician also
may "bend over backwards to assist a patient in obtaining bene-
fits . . . [and] is often not a specialist in the patient's
ailments, as the other physicians who give evidence in a dis-
ability case usually are."  *Hofslien v. Barnhart*, 439 F.3d 375,
377 (7th Cir. 2006) (internal citations omitted).

The ALJ requested clinical findings for Dr. Oetter's assess-
ment to clarify inconsistencies with the record, but Dr. Oetter
failed to provide this information.  (Tr. 18) Because Dr. Oet-
ter's assessment was inconsistent with the other evidence in the
record, including that of the specialists he recommended, the ALJ
chose to adopt the medical expert's assessment to resolve the
discrepancy.  (Tr. 18) The ALJ cited reasons for his determina-
tion, specifically that Dr. Oetter could not provide clinical
determinations to support his findings.  The ALJ also stated that
"Dr. Oetter appears to be the claimant's primary care physician
who chiefly treats [her] for minor or limited ailments.  He
refers her to specialists like Dr. Brazley, Dr. Akan and Dr.
Kondamuri for her musculoskeletal and pain issues.  The special-
ists have essentially ruled out any ongoing major spinal or joint

problems." (Tr. 18) Thus, the ALJ properly rejected Dr. Oetter's opinion by citing specific reasons why his opinions should not be given controlling weight, and the ALJ assigned greater weight to the specialists Dr. Oetter recommended.

Rogers also alleges that the ALJ failed to explain why he did not include any limitation in the use of her hands. However, the ALJ discussed Rogers' testimony of her limitations in the use of her hands. (Tr. 16) Rogers explained that her hand would turn blue and go numb, making her unable to type. Although the ALJ considered Rogers' testimony, he chose to adopt the opinion of the ME, who stated that the only limitations Rogers had in the use of her hands was due to her Raynaud's syndrome and because of this she should avoid work in extreme cold. (Tr. 17) Neither Dr. Oetter nor the specialists made any mention of hand use limitations. The ME found that Rogers' alleged limitations exceeded those that reasonably could be expected in light of the actual clinical findings which showed "basically full use of the upper extremities." (Tr. 17) Because the medical evidence did not support Rogers' testimony, the ALJ properly rejected the hand use limitations as described by Rogers and adopted the limitations that Dr. Newman described.

Finally, in regard to the RFC determination, Rogers claims that the ALJ did not discuss her need to elevate her legs period-

ically.  Nevertheless, the ALJ justifiably adopted the ME's
assessment which did not require Rogers to elevate her legs on a
regular basis.  (Tr. 18) The ME rejected Rogers' claim of the
need for periodic leg elevation because her complaints of numb-
ness in the right leg were not corroborated by the nerve conduc-
tion studies and the physical examinations revealed no atrophy of
the musculature in the lower extremities, indicating that she was
using both legs.  (Tr. 17) Moreover, Rogers' treating physician,
Dr. Oetter, indicated in his RFC questionnaire that Rogers did
not need to elevate her legs with prolonged sitting.  (Tr. 595)
Because the ALJ is not required to discuss every piece of evi-
dence and none of the medical evidence of record suggested that
Rogers was so limited, the ALJ's reasoning is apparent and
adequately supported by the absence of evidence.  *See Getch*, 539
F.3d at 480 (explaining that the ALJ is not required to specific-
ally discuss every piece of evidence).

It is apparent that the ALJ completed a thorough examination
of the evidence and created a "logical bridge" between the evi-
dence he described and his conclusion that Rogers could perform
sedentary work.  The ALJ extensively discussed Rogers' medical
history and diagnoses using specific medical facts from Rogers'
several specialists such as physical examinations, test results,
and diagnostic impressions.  (Tr. 12-16) The ALJ explained that

although Rogers "alleges a severely restricted life style limited by severe pain," the several specialists she has seen ruled out "any ongoing spinal or joint problems" and have recommended "conservative management" of her pain. (Tr. 17-18) This demonstrates a line of reasoning from the ALJ's evidentiary discussion where the specialists could find no specific pathology for Rogers' symptoms and suggested mostly conservative treatment such as weight loss, smoking cessation, and pain medication, and his conclusion that she could perform sedentary work. (Tr. 17) The ALJ's opinion included a discussion of the "aggregate effects" of all the conditions even though he was not required to give a written explanation for every piece of evidence. *Golembiewski*, 322 F.3d at 918; *Getch*, 539 F.3d at 481. Consequently, the ALJ properly determined Rogers' RFC.

Rogers' second challenge alleges that the ALJ did not follow the requirements of SSR 82-62 before determining that Rogers could return to her past work as a telemarketer. SSR 82-62 "requires that the ALJ make specific findings regarding a claimant's capacity to do past relevant work." *Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir. 1991). Specifically, SSR 82-62 provides that:

> In finding that an individual has the capacity to perform a past relevant job, the determination or decision must contain among

the findings the following specific findings
of fact:

> 1.  A finding of fact as to the
>     individual's RFC;
>
> 2.  A finding of fact as to the
>     physical and mental demands of
>     the past job/occupation;
>
> 3.  A finding of fact that the
>     individual's RFC would permit
>     a return to his or her past
>     job or occupation.

Additionally, SSR 82-62 explains that:

> Determination of the claimant's ability to do
> PRW requires a careful appraisal of (1) the
> individual's statements as to which past work
> requirements can no longer be met and the
> reason(s) for his or her inability to meet
> those requirements; (2) medical evidence
> establishing how the impairment limits the
> ability to meet the physical and mental re-
> quirements of the work; and (3) in some
> cases, supplementary or corroborative inform-
> ation from other sources such as employers,
> the *Dictionary of Occupational Titles*, etc.,
> on the requirements of the work as generally
> performed in the economy.

The ALJ's decision included a finding of fact as to Rogers'

RFC, a finding of fact as to the physical demands of Rogers' past

telemarketing job, and a finding of fact that Rogers' RFC would

permit a return to telemarketing.  (Tr. 18) As discussed above,

the ALJ's RFC determination was proper.  The ALJ adopted Dr.

Newman's assessment which determined that Rogers could sit for 90

minutes at one time and for six hours during a typical workday,

stand and walk for 45 minutes at one time and for three hours during a workday, occasionally lift up to 15 pounds and frequently lift up to ten pounds, and frequently carry up to ten pounds. (Tr. 17) The assessment also found that Rogers had full use of her upper extremities except that she should not work in cold temperatures or in a freezer due to her Raynaud's syndrome. (Tr. 17)

Rogers and the VE testified to the physical demands of her past job. Rogers indicated in her work history report that her past work as a telemarketer required mostly sitting at a desk making phone calls with no heavy lifting or carrying. (Tr. 190) Rogers' attorney verified during the hearing that the report was correct and that no further questions needed to be asked of Rogers regarding her work. (Tr. 27) Based on the VE's testimony that the limitations described in Dr. Newman's assessment would not preclude performance of Rogers' past work as a telemarketer, the ALJ found that Rogers' RFC would allow her to return to this job. (Tr. 18)

It was not necessary for the ALJ to turn to outside sources because the VE, in his professional opinion, determined that Rogers' previous work as a telemarketer qualified as sedentary work. (Tr. 73-74) The VE reviewed Rogers' work history without questions. (Tr. 73) His testimony was consistent with the

*Dictionary of Occupational Titles* and Rogers' description of the work as she performed it. (Tr. 74, 77) The ALJ stated that he compared Rogers' RFC as determined by the ME with the physical and mental demands of telemarketing as explained by the VE and found that Rogers was able to perform the work as she previously had and in the way it is generally performed. (Tr. 18) Finally, the ALJ noted that the VE testified that the limitations listed in the RFC would not preclude Rogers from returning to her previous work as a telemarketer. (Tr. 18)

Rogers more specifically argues that the ALJ should have considered the finger limitations Rogers described in her testimony when assessing her ability to return to her past job. However, as previously discussed, the ALJ's disregard of Rogers' finger limitations was adequately supported by the absence of any medical evidence. The ALJ properly adopted the ME's RFC assessment which determined that Rogers' only hand use limitation was to avoid working in cold temperatures and freezers. (Tr. 17) Thus, the limitations that Rogers testified to were not part of her RFC and did not have to be included in the ALJ's past relevant work analysis. The ALJ correctly followed the requirements of SSR 82-62 in determining that Rogers could perform her past work as a telemarketer.

Rogers' last challenge claims that the ALJ erred by not
analyzing whether Rogers' impairments met the criteria of Listing
1.02 and Listing 1.04.  Listing 1.02 states:

> Major dysfunction of a joint(s) (due to any
> cause): Characterized by gross anatomical
> deformity (e.g., subluxation, contracture,
> bony or fibrous ankylosis, instability) and
> chronic joint pain and stiffness with signs
> of limitation of motion or other abnormal
> motion of the affected joint(s), and findings
> on appropriate medically acceptable imaging
> of joint space narrowing, bony destruction,
> or ankylosis of the affected joint(s).
>
> 20 C.F.R. part 404, subpart P, app. 1, §1.02

Listing 1.04 states:

> Evidence of nerve root compression character-
> ized by neuro-anatomic distribution of pain,
> limitation of motion of the spine, motor loss
> (atrophy with associated muscle weakness or
> muscle weakness) accompanied by sensory or
> reflex loss and, if there is involvement of
> the lower back, positive straight-leg raising
> test (sitting and supine)[.]
>
> 20 C.F.R. part 404, subpart P, app. 1, §1.04A

It is the claimant's burden to show she met each of these
criteria.  *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004).
In order for an individual to be disabled under a particular
Listing, her impairment must have met each distinct element
within the Listing.  *Rice*, 384 F.3d at 369.

The ALJ did not cite or discuss Listings 1.02 or 1.04 in his
opinion.  The failure to cite or discuss a Listing without

further explanation may require remand. ***Brindisi ex rel. Brindisi v. Barnhart***, 315 F.3d 783, 786 (7th Cir. 2003). Nonetheless, the ALJ's failure to cite and discuss Listings 1.02 and 1.04 was a harmless error because Rogers did not adequately meet her burden to demonstrate she met each of the criteria required by the Listings. *See Rice*, 384 F.3d at 369 (explaining that the claimant must establish that the medical evidence of record could reasonably lead to a conclusion that she meets or equals a Listing); ***Ramos v. Astrue***, 674 F.Supp.2d 1076, 1092 (E.D. Wis. 2009) (finding that it was harmless error when the ALJ failed to discuss the Listings because the claimant did not show that his conditions met or equaled a Listing).

The ALJ adopted the ME's RFC assessment which stated that there was no atrophy of the musculature in the lower extremities and that there were no signs of neuro-anatomic abnormalities or nerve root impingement since Rogers' surgery in December 2004. (Tr. 17) Rogers did not challenge this finding in the RFC. Because Listing 1.04 requires "evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, and motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss," Rogers could not meet the necessary criteria.

Furthermore, a CT scan of Rogers' right hip showed mild degenerative changes and a slight restriction, and the most recent MRI in 2008 was unremarkable with good range of movement. (Tr. 14) Dr. Bush-Joseph also found that there was no significant joint space narrowing in May 2006. (Tr. 447) These findings hardly qualify as a "gross anatomical deformity" with "joint space narrowing, bony destruction or ankylosis of the affected joint" required for Listing 1.02. 20 C.F.R. part 404, subpart P, app. 1, §1.02. Although the ALJ's discussion of relevant medical evidence and testimony is not found under the third step, the misplaced discussion is sufficient to find that his error was harmless because a finding that Rogers met the Listings would not occur on remand. Rogers has not demonstrated that her impairments as determined in the RFC could satisfy the Listings.

Rogers also argues that the ALJ erred by not having the evidence submitted after the hearing evaluated by a medical expert because this could have affected the Listings analysis. This court can order the Commissioner to hear new evidence if there is "new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. §405(g). "[New] evidence is that which is 'not in existence or available to the claimant at the time of the administrative proceeding.'" *Simila*

*v. Astrue*, 573 F.3d 503, 522 (7th Cir. 2009) (*quoting* **Perkins v. Chater**, 107 F.3d 1290, 1296 (7th Cir. 1997)). "[N]ew evidence is 'material' if there is a 'reasonable probability' that the ALJ would have reached a different conclusion had the evidence been considered." **Simila**, 573 F.3d at 522 (*quoting* **Schmidt**, 395 F.3d at 742).

Although the evidence presented by Rogers was "new" evidence because it was not available at the time of the hearing, it was not "material" because the ALJ would not have reached a different decision if the evidence had been available at the hearing. The new evidence submitted by Dr. Akan and Dr. Brazley showed some difficulty ambulating, abnormalities in Rogers' ability to use input cues from the somatosensory system, difficulty performing motor control testing secondary to lower back pain, and abnormalities in Rogers' reaction time. (Tr. 740) These findings did not show the existence of a "gross anatomical deformity" as required by Listing 1.02 nor did they tend to prove nerve root compression accompanied with any of the conditions necessary to establish that Rogers meets Listing 1.04. Consequently, the ALJ did not err by not having a medical expert evaluate the new evidence.

————————————

The ALJ properly determined Rogers' RFC and followed the requirements of SSR 82-62 before determining that Rogers could

return to her past work as a telemarketer.  Furthermore, the
ALJ's error in not citing or discussing the specific Listings was
harmless.  His decision is therefore supported by substantial
evidence of record, and the decision of the ALJ is **AFFIRMED.**

ENTERED this 14th day of September, 2011


s/ ANDREW P. RODOVICH
     United States Magistrate Judge

46